Your Honors, may it please the Court, my name is Howard Davis. I'm representing the petitioner, Petro Nosa. The essence of this case is an adverse credibility decision. The argument here is that there is no substantial evidence in the record to support the Board's decision. And I urge that the Court find that the record compels the reversal. One of the disturbing aspects of this case is the way that, for example, the Board handled the evidence in the record. For example, if you turn to the decision of the Board on page 2 of the administrative record, first of all, it agrees with the judge and focuses on the inconsistencies. And among the inconsistencies that the Board points to is testimony about what happened during a particular arrest, and then comparing it with Exhibit 2, which is the asylum application, stating that the respondent admitted mention in an asylum application of any of those events central to his claim that he was arrested, harmed, and released. That simply is incorrect. If one takes a look at the administrative record of that Exhibit 2, which begins on 189, and then as part of that there's an addendum that begins on 198, you have a list of all these things that happened. And with regard to the particular event in mind, which was what happened to Mr. Nosa in September of 2001 after a conference that related to Chernobyl, that whole thing begins on 201 and goes on to 202. At the same time, there's reference to a statement. Mr. Nosa presented two statements, and a supplemental statement that is on page – referred to begins on – is on 182. And so that is – and one of the other problems here is that there's a reference to inconsistencies. One of the problems here is that, by and large, the immigration court judge did not even confront Mr. Nosa on any of his problems. That – I mean, that's clearly the law of this circuit, that if the judge has a problem with issues of consistency between testimony and documents, et cetera, the judge has to specifically ask them about it. The judge did not do it. The only thing that you see here is having to do with testimony. And this is something that the Board refers to, respondent without explanation providing inconsistent testimony regarding the events that allowed him to flee his country. So did he pay $2,500 of the currency? Did he borrow $2,500 or $2,000? The record says that he originally stated – He said $2,000 or more. Over $2,000. Now, why isn't that $2,500? So these are the things that – the other thing that I find very disturbing is the way that the Board and the court mischaracterized his claim. You would have thought that, you know, Mr. Nosa was, you know, just trying to go to synagogue and, you know, he was having a problem. That's not the problem. He was attacked on several claims because of his Jewish ethnicity. Now, one of those cases happened to be on the way to the synagogue, and another time was around Passover time. But he was attacked because of his ethnicity. At the same time, it's not only because of his ethnicity, but there was a political opinion aspect to it, and that arose out of his statements that he made at this conference on Chernobyl in which he – in which it was a criticism of the government that he couldn't get protection and that he had problems because he had been attacked. And so then all the discussion, all the – whatever was said to him afterward had to do with, well, you know, you're not respecting the government, things like that. And, in fact, the judge even noted in his oral decision that, yeah, no, I see that he sees a – that there is a – that he could see that there's a political opinion aspect to this. And this – the handling of the country background reports, and also the judge comes off as being soft-peddling, almost comparing, well, things that happen in Ukraine, it's just like in the United States. You know, I could understand. I mean, that sort of soft-peddling is, in a case like Shaw, this Court has criticized. So that's the other – the other thing that I also find troubling is, is that – Do you find it troubling that his wife was also persecuted, and that the person who came to this country was just the doctor and his girlfriend? You know, I – The family was left behind. Does that trouble you? Well, but there is an indication that his wife was persecuted. The focus of the persecution was on him. Well, I think there's something that the – didn't they come to the home and persecute? Well, the – Didn't they? My understanding of the record is, is that – well, first of all, they came to us with regard to – Are you – Yes. Are you asking about the very last events? That he came to his home – it just mentions that they came for him. There was no mention of anybody else around there, and that the focus was on him. The other thing is, is that – But if Jews are troubling – I don't know whether his wife is Jewish or not, but the record suggests that the family was being persecuted. Well, certainly his parents. Did I miss something? The parents, actually. The events that happened in April of 2001 really – this was something that involved his parents. His parents were being attacked by nationalists, and that's – and so it's both him and his parents. But not his wife and not his children. There wasn't – there was, as far as my understanding of the record, is that there wasn't. It was he – and also his son in one event, in one of the earliest, in 1997, when they were on their way to the synagogue, Mr. Nosen and his child were going to the synagogue, and his child was hurt, his seven-year-old, at that time. The other thing is – And the seven-year-old, where is she now? No, I have to say that – They're still in Ukraine, aren't they? They moved from the city, but they're still – But that is not really a discussion in the record. I know that he has a child here. We're going to decide on the record. Pardon me? We're going to decide on the record, so we aren't going to be on the record. And then one other thing that I actually find disturbing is the fact that the – Mr. Nosen submitted personal documentation, not only about his being a doctor and all that, but the medical report from the April 2001 event and other matters, and the government had no objection on page 59 of the administrative record. The government had no objection. Nowhere was it referred to in any kind of discussion about the credibility. Anyway, I – Would you like to save the balance of your time for – Yes, I do. Okay, thank you. Thank you. May it please the Court, my name is Brooke Maurer. On behalf of the respondent, the Attorney General, this case before you is a Ukrainian national doctor who, upon his second arrival to the United States, determined that he was going to apply for asylum. The immigration judge and the board used – Could you help me with one thing? As I read the board's decision, what did they do? Did they conduct their own independent review or did they adopt part of the IJ's decision? How do we – are we reviewing both decisions together to fill in the picture? Well, right – What was this? Well, it appears that the board adopted the adverse credibility finding of the judge. As you see, the IJ also made an alternative finding that actually decided on the merits, but it appears that the board only addressed the actual adverse credibility finding. Right. So you'd be looking at the adverse credibility finding of the board. So the board adopted the IJ's adverse credibility finding? Correct. That's all that happened here? Yes. There was no independent review? An analysis of the merits. Now, they came up with another reason. They said, well, he never explained the inconsistencies. That is correct. That was not what the IJ said? No. Where did that come from? I believe they looked at the discrepancies between what the petitioner had testified to and what he had omitted from his asylum application and supplemental statements and had not looked at – But he was never asked at the hearing, can you explain these inconsistencies? No, but he was – actually, the IJ about seven occasions actually interjected during direct examination and started questioning the witness as to the situations that occurred when he was back in the Ukraine. Let me ask you this. Were there really inconsistencies? Some of them are omissions and other ones where it was inconsistent. The judge acting as a trier of fact, looking at the record as the petitioner, at each time, the first of the asylum application, everything started to snowball. There was much more embellishment with each and every one. And the IJ, looking at this person sitting in front of him, he found it not believable based upon the fact that first he testified that he was going to have – he had an internal passport that identified him as Jewish, yet then he testified that the nationalists or the militia had actually asked him to identify those of whom who were Jewish in the community who were harmed when the IJ found that odd based on the fact that there were internal passport documents that would be able to locate such individuals. Things like that that the IJ found were inconsistent with what he should have listed on the asylum application, which were the fact that he was actually arrested and beaten based upon his ethnicity, which would be central to his asylum claim. Things like that that the IJ found. But he provides additional information in his supplements. That is correct. And it keeps getting – It doesn't look like anybody really even considered the information contained in the supplements, which are all filed before the IJ hearing. Well, as the immigration said, that he looked at the testimony of itself. And as you can see, as it keeps going, it just – But he just looks at what's in the application. If you read the application, he says he would – he even – at the bottom of it, he says some of the details he would like to give at his confidential hearing. He provides supplemental information and a supplemental declaration, I think, in two different instances, or at least one. And – but nonetheless, the IJ just looks at what was contained in the application. And that, along with the testimony that kept expanding, the IJ rendered him incredible. But the – but the application was simply incomplete. It wasn't really inconsistent with anything that happened thereafter. No, but as – as the Court says, as the Court's – the IJ sits before him looking at – as a matter of fact, looking at everything, looking at his internal inconsistencies, whether or not – and when he questioned him, especially about – I know it's not central to the claim that he made about the actual monies and how he rendered them. The testimony was ever-changing, and it becomes vague and changes throughout. I don't see where that changed at all. I mean, and you're talking about something that has nothing to do with the heart of the application. When somebody makes that in a silent application, I never had the opportunity to do that. But they're under a lot of pressure. They have a limited amount of time. And is it not unusual for these to be generally kind of incomplete, and isn't that what the hearing is all about, and to get supplementary information to fill in the gap, so to speak? Well, yes. Generally, they are. They can be – they can be very general, and they can go into more detail. However, even the Petitioner himself had said in the testimony, when he had came to the United States for the first time back in 2001 with his girlfriend, he had no intention of leaving the country. He had no intention of actually filing for asylum. And most of these events, which he testified to be actually persecutory, were already had happened, and it wasn't until he had left and come back that he decided that he was going to file. Wasn't that heir to his credibility, the fact that he wasn't here in the first instance to seek asylum at all costs? He was willing to go back, give it another shot in his native country, but things then escalated, and then he had these other thoughts? I mean, doesn't that sort of lend credibility to what he's all about? In some respects, but as I said, I wasn't there. The immigration judge was there, and he listened to the testimony as it was developing and deemed him incredible. Any further? And the Government will submit. Your Honor, just to go to a question that Judge Plante has asked is about what are we looking at here in terms of what are we reviewing? I mean, this, and the way I wrote my brief, I thought it was the BIA's decision. This is not, A, an affirmed without opinion, or this is not a matter of Bourbon type of matter, although he mentioned there's a decision he did not cite to, the Board did not cite to Bourbon, and then he, then they focused on what they were dealing with here. Otherwise, unless the Court has any other questions of me, I submit. Thank you. The matter will be submitted. Let's see. Our next case for argument is, on the calendar, is Craig v. Astrew, but that's been submitted on the briefs. And then our last case, we need to take a break so we can have Judge Goodwin step in. So we'll take a ten-minute recess. This part of the session stands adjourned. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Farris, Paez, Block